in this case. There are two parts to my client's argument. One, of course, is that the court has jurisdiction to consider the incompetent representation argument he's made, even though he didn't present it to the Board of Immigration Appeals below. And the second part of the argument is that the incompetent representation that he's alleged here rises to the level of a due process violation and, therefore, calls for a remand to the Board of Immigration Appeals so that they can reconsider its decision to deny his original motion to reopen. The authority for both parts of that argument is that the recent case I've cited this morning or actually I filed it yesterday under Rule 28J, that is the Granados-Osagura case, which is just decided in September after the briefs in this case were filed. And though the facts of the two cases are somewhat different, the rationale of Granados fits the rationale of this case as well. And by that I mean in the Granados case, the reason the court held that it had jurisdiction to review the issue, even though it wasn't presented below, was that a motion to reopen which had been filed by counsel with the Board of Immigration Appeals was filed by the same lawyer who was guilty of the incompetent representation. And, therefore, he wasn't likely to reveal his incompetence when he filed that motion and in that sense was unable to exhaust the administrative remedy of his client. It's true that the incompetent representation in the Granados case is a little more obvious than it is here, but the incompetent representation exists here as well. And it consists, it goes way back, really, it goes back to when my client, Mr. Mendez, who was only 17 years old when he came to the United States, didn't understand the language, went to an immigration consulting firm in the Los Angeles area, went there because it advertised itself as experts in immigration law, showed that there were notarios who worked there, and in Latin American countries a notario is supposed to be an official who understands legal principles. He was misled there into filing an asylum application for which he was clearly ineligible. He then was referred to a lawyer who eventually was disbarred, who neglected to file a motion to reopen after the immigration judge had ordered Mr. Mendez deported in absentia when he was late to his hearing. The lawyer, Mr. McGuire, simply neglected to file a motion to reopen even though he was authorized to do it by Mr. Mendez. And then, of course, according to Mr. Mendez's declaration, he was told by McGuire not to worry about it. Things take a long time at the immigration office, so he didn't worry about it for a while. Just to interrupt for a second. Sure. I'm sorry. Had he gotten his hearing, what relief was he asking? Well, that's an interesting point, too, Your Honor, because one of the things that Mr. McGuire did not tell his client was that he simply was ineligible for asylum. He had filed the asylum application based upon the advice of the notario, the immigration consultant. Competent lawyer would have told him... He was conceding deportability or... I'm sorry. I'm having a little trouble here. He was conceding deportability or removability... That's right. ...and asking for asylum. That was what the hearing would have been about. Right. But what he should have done, what counsel should have told him was that, indeed, counsel knew that he was married to a lawful permanent resident, could qualify someday for lawful permanent residence. Davis himself should have said to his client, look, you leave the country, and when your wife becomes a U.S. citizen, you'll be able to return to the United States as a lawful permanent resident. He wasn't told that. Subsequently, of course, according again, according to his declaration, when he didn't hear from Mr. McGuire, he tried to reach him, was found out that his telephone was disconnected, went to the immigration office to find out about his case. There was obviously some sort of confusion there because he says that he was told not to worry about it. Cases take three or four years. We have declarations in the record from counsel who work in the Los Angeles area that things do take that long in the immigration context. In the meantime, because he wanted to qualify for permanent residence through his wife, she went to the immigration firm, not the immigration firm, but a so-called law firm, to find out about helping her husband become a legal resident. Mr. Mendez himself went there, and though he unfortunately stated in an intake sheet that he had never been in a removal or a deportation proceeding, no one ever talked to him, no lawyer ever talked to him, no lawyer ever spoke to him at any time subsequently, even though this is a law firm and presumably he was going there for legal advice. A competent lawyer who had reviewed that document and who would have interviewed Mr. Mendez would have learned reasonably, should have learned that there was a deportation proceeding, that there was an outstanding in absentia order for his removal. He could have filed a motion to reopen still within that 180-day period because, again, according to Mr. Mendez's statement and even the counsel for the law firm has indicated that Mr. Mendez came to that office in June of 1996, which was still within the 180-day window in which he could have filed a motion to reopen. That wasn't done, and even though time passed and their proceedings were going on for Mrs. Mendez's naturalization and petition that she filed for him, no lawyer in that firm ever contacted, ever spoke to Mr. Mendez, never tried to find out what was really going on in the case until finally when they did submit an application for a permanent residence status and discovered that there was an in absentia order. And even then the firm waited another two years before it filed a motion to reopen, and it did so, again, although it was ostensibly improper, as we've indicated in the briefs, it was prepared by a law clerk for that particular firm who was clearly practicing law without a license to do so. I understand he could file another motion to reopen, couldn't he? I beg your pardon? He could file a motion to reopen today. He could. Based on equitable tolling. Correct. And effective assistance of counsel. That's right. And whatnot. He could do so, and it's certainly something that occurred to me. However, according to Granado's case, it wasn't exactly incorrect to proceed before the court itself. I'm certainly prepared to do that if the court wants to hold this case in abeyance. I'll be happy to file a motion to reopen with the Board of Immigration Appeals and see what happens to that. Good. I think that's the gist of my argument, Your Honor, unless the Court has other questions. I gather to get to a justice status through his now naturalized citizen wife, he has to get rid of this. He has to get voluntary departure. Well, not necessarily. I mean, he could leave the United States. He would be leaving under an order of deportation, which would make it more difficult for him to come back, certainly would delay his return to the United States. He would have to apply for a visa through the American embassy or consulate in Mexico. By how much longer would it delay his return to the country? There's no way of knowing that because a person who's been deported cannot return for a period of 10 years unless the immigration authorities grant him permission to come back sooner. That application would have to be filed as part of an immigrant visa application in Mexico. Then have to go to the immigration office in Mexico from the American consulate that issues the visa. And there's no way of knowing how long that would take. It could be months. It could be years. And there's no guarantee, of course, that it would be granted, which could be in a separate case. And if he gets rid of the order of deportation and obtains voluntary departure, what does that mean? He would still have a problem because there's another provision in the law which says that if a person who's been unlawfully present in the United States for as much as 180 days or more than a year, if the unlawful presence is more than a year, then one cannot return to the United States for a period of 10 years unless he gets a waiver of that requirement based upon hardship to his American citizen wife. There again, no one knows whether an application like that would be granted, and if so, how long it would take to be granted. So there's a real risk of a significant separation from his family if he has to leave the United States. Do those waivers in both cases require a hardship showing? No. The permission to reapply after deportation does not require a hardship showing, but the unlawful presence one does. Thank you very much. May it please the Court. My name is Jonas Geisler. I'm an attorney for the Department of Justice. I represent the respondent in this matter, the Attorney General of the United States. This Court should affirm the BIA because Mr. Mendez cannot avoid his personal responsibility in failing to act for nearly seven years after the 180-day deadline had already run. Second, the Court did not abuse his discretion in holding that Mr. Mendez failed to state a claim in his complaint with Lazada. And lastly, Mr. Mendez admits that, at best, had he shown up to his hearing, he would have been dependent upon the immigration judge's favorable exercise of a discretionary relief, that is, voluntary departure. Mr. Mendez has no due process interest in such a discretionary benefit and, therefore, has failed to state a claim for ineffective assistance. What's really important here is the timeline of the matter. Mr. Mendez, after two delays at his request, is ordered to appear January 2, 1996. He fails to appear. Some 40 minutes after the scheduled start time of the hearing, he appears. The immigration judge, in the governing of his own courtroom, has already entered the in absentia order and invites Mr. Mendez. Has already what? I'm sorry, you're dropping your voice a little bit. Has already entered the in absentia order of deportation, and that is based on the admitted facts in the order to show cause. He invites Mr. Mendez to file the motion to reopen. Mr. Mendez apparently informs his then-counsel, Terrence McGuire, in January 1996, he doesn't again contact Mr. McGuire until February 1997. Then he does not again attempt to contact Mr. McGuire until March 2000. Neither time does he reach Mr. McGuire. And lastly, he makes his final attempt to reach Mr. McGuire in January 28, 2003, with his Lozada letter. Now, it's conceded, I believe, that the 180-day deadline is passed, and the only issue really becomes whether or not Mr. Mendez has exercised enough due diligence to toll the deadline in order that we can then reach his other claims. However, in order to consider most of the argument the counsel now raises for Mr. Mendez, we have to consider an appendix attached to his brief that's not part of the administrative record. I submit to Your Honors that even if we consider this appendix, even if Your Honors consider this appendix, that it does not change the outcome. Mr. Mendez asserts that all those years should be told because he attempted to bypass his deportation hearings and attempt to legalize his status through his wife. He was married roughly a month after he failed to show for his deportation hearing. He was not married beforehand. Principally, Mr. Mendez now asserts that he showed up to an INS office in 1997, after February 1997, and he asked somebody at a window, generally about immigration proceedings. That person didn't receive his file, didn't look it up on the computer, but generally told him immigration matters should take a few years and not to worry unless he received a notice from the INS. But Mr. Mendez has already stated that he had received a notice of deportation. Mr. McGuire or, excuse me, Mr. Mendez acknowledges his deportation issues in February 1997 by attempting to visit his attorney and, again, by going to the INS office. Yet in July 8, 1997, Mr. Mendez, through his wife, files a Form I-130 in which he falsely states that he is not involved in any immigration proceeding. That alone shows a lack of due diligence. But it proceeds further than that. Even if we assume that Mr. Mendez's new statements about confusion from the INS occurred, that lack of clarity was rectified, was made clear, by September 1997, when the INS responded to the Form I-130, gave a notice to Mr. Mendez's wife and her attorney, Ms. Linda Howard, who had never received a Lozada letter, by the way, and informed Mr. Mendez through that Mr. Mendez did not. And that once he rectified his adjustment status, he could then file Form 485. Between 1997 and 2001, Mr. Mendez does nothing in this regard. But in February 2001, Mr. Mendez does indeed file Form 485. But he has not adjusted his status. He has not contacted INS or the IJ. Instead, he again falsely answers, saying he's not in a deportation proceeding. And now, to this court, he submits in his appendix that if he had known that his wife's and her attorney's questions were important, he would have changed his answers. In other words, he would not have lied. Because Mr. Mendez plainly cannot show diligence by these repeated statements, he plainly cannot show diligence to this court to justify tolling. Even if we get beyond the tolling argument and approach the Lozada argument, the Board and the IJ do not abuse their discretions in their Lozada decision. Lozada is essentially a procedural process. The BIA proposed in order to weed out ineffective assistance of counsel claims to then approach the question of prejudice. The last prong of that, of course, is to state whether a disciplinary proceeding has been commenced against the attorney. And if not, why not? And the BIA clarified the importance of this last step in the Assad matter. Yet Mr. Mendez stated simply that he elected not to report Mr. Maguire to the bar because he saw no personal benefit in doing so. Now, whether or not Mr. Mendez believes that he personally can benefit from it, there was a requirement the BIA came up with. And by that time, Mr. Maguire, from what I can tell, had been in disciplinary proceedings before the California State Bar for this very kind of activity. I believe that in the pendency of the appeal since that time he has, I'm not sure, Your Honor, that indeed in 2001, that it seems to me he was the subject of one of our other major opinions in this whole area. And he's had a host of problems with the bar. And then again, even if he, even if Mr. Mendez could have met the Lozada requirements with respect to Mr. Maguire, he cannot show that he was prejudiced because Mr. Mendez plainly states now that he was not entitled to asylum, as you've just heard. And he would be dependent upon the exercise of discretion. Now, in the latest brief from Mr. Mendez, we see an argument that his due process rights are in one, his marriage, and in two, a process of applying for voluntary departure, and really neither of those create a due process interest. The process of applying for discretionary relief does not afford a due process interest according to the Ohio Adult Parole Board decision. And the marriage case cited for Mr. Mendez really has to do with the denial of a license to marry based upon child support arrearages. It has nothing to do with these matters. And indeed, Mr. Mendez did marry in February 1996, shortly after his hearing and well within the 180-day deadline. And this all started when he failed to appear at the hearing in a timely way, right? Isn't that right? Yes, it did. He was, what, 40 minutes late? 40 minutes late, very similar to the 45 minutes late that was cited in the Sharma case. And the I.J. wouldn't take up his case when he arrived? Well, in governing his own courtroom, most like. I understand. I ran my own courtroom for many years. And indeed, he did invite him to file the motion to reopen. And had Mr. Mendez. Could have extended a little generosity. But he didn't abuse his discretion? Well, that's not before us, but I'm just making an observation. So, accordingly, given that the BIA did not abuse his discretion, Mr. Mendez did not have a protected liberty interest to serve here. And I would like to add that the Granado's case that was cited was turned upon a proposition that the single attorney who carried the case all the way through was responsible for the delay. In this case, there were two sets of attorneys, and now Mr. Argyros is the third. In that break between the two sets of attorney, there needed to be a sharing of information from the client to the attorney, and there was not. There was instead a false form filed in 1996. Then Mr. Mendez did not show up again at that attorney's office until 1997, over a year. If he didn't believe Mr. McGuire could handle the motion to reopen, then, indeed, he could have pursued with another attorney, but he chose to do nothing, and, indeed, he lacks any diligence. Accordingly, given that Mr. Mendez does not show the diligence, and there's a strict deadline that Congress intended to address just this type of situation, there is no basis at all for seven years for a 180-day deadline. I thank the Court. Mr. Argyros, you had it. Two quick points, Your Honor. This issue of personal responsibility and what Mr. Mendez did or didn't do, I think it's important to look at the entire context of what was going on here. I mentioned earlier you have a young man from a strange country, and I've asked myself the same question. If I were a stranger in another country and I had this kind of issue, who would I rely on? I would go to people who presumably know what the law is all about and can advise people correctly. Mr. Mendez went to three different places and got terrible advice all three times. I think it's understandable and reasonable that he would rely on these people to do that. Nobody told him about the consequences of not filing that motion to reopen timely. And the last part about his failure or alleged failure to show up for the hearing, the issue really wasn't whether he failed to show up, but because he did show up. It's a question that he did appear, and that's consistent with the Gerozano case. It's not that he failed to show, but that he did appear and whether he did appear timely because the judge was still on the bench and could easily have heard his case at the time. Thank you, Mr. Argyros. We appreciate the arguments. They're helpful. Thank you.
judges: Canby, Cox , Paez